# CIRCUIT COURT OF BALTIMORE CITY.

Filed October 23, 1901.

## WALDO NEWCOMER
## VS.
## WALTER B. BROOKS, JR.

*George Whitelock* for plaintiff.
*T. Wallis Blackistone* for defendant.

RITCHIE, J.—

When a real estate broker who is authorized to sell at a specified price sells for a larger sum, the excess over the price specified belongs to the owner of the property sold.

A usage among real estate brokers to the effect that such excess belongs to the broker is void.

A real estate broker employed to sell has no implied authority to receive payment of any part of the purchase money, or to stipulate in the contract of sale that any part of it shall be paid to himself.

The bill in this case asks for a decree requiring of the defendant the specific performance of a contract executed on his behalf by M. & J. Brandt, real estate brokers, for the sale of the plaintiff of the fee-simple premises No. 28 East Mount Vernon place.

The wife of the defendant, who was not a party to the alleged contract, refuses to unite in a deed of the said property, and in view of such refusal,

the plaintiff tenders himself ready to accept a deed from the defendant alone, and to take the property subject to his wife's inchoate right of dower, and without any abatement of the purchase price.

The first ground of defence is that M. & J. Brandt were not authorized to execute this contract on behalf of the defendant and that he is not bound thereby.

This question as to the validity of the contract makes necessary at the threshold an inquiry into the circumstances under which it was executed, for unless M. & J. Brandt were duly authorized by the defendant to execute this contract on his behalf, there is no valid existing contract to be enforced.

The defendant authorized M. & J. Brandt to sell this property for $25,000 net, that is, for an even $25,000, provided the purchaser paid the commissions of two and a half per cent., or for a sum that would yield him $25,000 clear, after deducting the amount of commissions. While willing to sell at this price he instructed them to hold the property at $27,000, and in March, 1901, it was offered by them to the plaintiff at this figure.

On April 15th, 1901, the plaintiff made an offer of $25,000, which was immediately reported to the defendant by Miss Brandt, and declined by him. Defendant asked Miss Brandt if the plaintiff would not also pay the commissions. She replied that such a proposition to a purchaser generally broke off the sale, whereupon the defendant told her to split the difference and offer the property at $26,000. Miss Brandt returned to the plaintiff and offered the property at $26,000; the plaintiff replied that he would buy at that figure, but would like to have the offer left open until next day. Miss Brandt then telephoned to defendant that the plaintiff would buy at $25,000 net, but would like to have the matter left open until next day.

The option was granted, and next day the plaintiff told Miss Brandt that he would take the property at $26,000. Miss Brandt thereupon telephoned the defendant that she had closed the sale at $25,000 net, which was less than the purchaser had agreed to pay. She then prepared and sent to the defen-

dant for his signature, a paper authorizing M. & J. Brandt to close the sale *at twenty-five thousand dollars net.* This was signed and returned by defendant, and she then prepared the contract of sale, which was executed by the plaintiff and by M. & J. Brandt, professing to act as agents of the defendant. This contract states that the property had been sold for $26,000, of which $500 had been paid to M. & J. Brandt and that of the balance, $25,000, was to be paid to the defendant *and $500 to M. & J. Brandt, Agents.*

It is true, as urged by the plaintiff, that authority to sell at a net or specified price, includes the authority to sell at a larger price, and that under the authority to sell for $25,000 net, the brokers here had authority to sell for $26,000. But that is not the point. The question of authority here arises, not over the price at which the property was sold, but over the terms of the contract in respect *to the payment of the purchase money.*

As fully appears by the testimony, the cash payment of $500 was received and is retained by M. & J. Brandt, not as agents, but as their own money, and the credit payment of $500 which is made payable to them is also claimed by them under the terms of the contract in their own right. It appears from the testimony that it was understood by the plaintiff also that this $1,000 belonged and was payable to M. & J. Brandt in their own right. This $1,000 largely exceeded what would have been the usual commission.

The question then is, did the defendant authorize a contract to be made for the sale of his house at $26,000, of which he was to receive only $25,000 and M. & J. Brandt were to have the remaining $1,000.

If the defendant was entitled to the entire purchase money, there is nothing in the authority he gave, or, as will be shown further on, in the recognized powers of real estate brokers, which authorized the payment of the $500 cash to M. & J. Brandt, or the execution of such a contract.

It is claimed, however, that the defendant was not entitled to the entire purchase money; that he was entitled to $25,000 only, and that the remaining $1,000 belonged to his brokers. The

claim to this $1,000, as set up by Miss Brandt in her testimony, is that, according to the usage of real estate brokers in Baltimore city, when the owner authorizes his property to be *sold at a certain price net, any excess realized over the specified price belongs to the broker.* This explains the peculiar terms of the contract.

She testifies as follows on this point:

Asked what would become of any excess if the property sold for more than $25,000 she answers; "that would come to the broker of course." Again, "his (Mr. Brooks') interest was $25,-000". Asked if the $26,000 ought not to have been made payable to Mr. Brooks, she answers, "not when I was instructed to always sell at $25,000 net—if I had sold at $40,000 the difference between that and the price given me by the owner would come to me. Any real estate broker will tell you that." Asked if Mr. Brooks was not entitled under the contract to $26,-000, Miss Brandt answers, "No, not at all. I had been paid $500 prior to the signing of the contract, and the contract called for the payment of $25,-000 to Mr. Brooks on the date of transfer and $500 more to me."

So positive is the assertion of her claim to this $1,000, that she has promised *to pay back to the purchaser* $375 of it toward the payment of his expenses in the transaction, saying to him that she did not care to retain more than the usual commission of $625. Referring to this gift back of a part of the purchase money, she says, "of course I could have retained the $1,000, selling it net, according to custom of the business." Again, this $375 which Mr. Newcomer was to receive back was "from the $1,000, that he was to pay me, not from the sum he was to pay Mr. Brooks."

Mr. Newcomer testifies in reference to this $375 that Miss Brandt said to him "this $1,000 in my hands leaves ample leeway to pay any legitimate expenses you may have." And again, that she said, "I am entitled to the whole $1,000, but I will give you the benefit of it in that way." Again, that she made the offer to pay his expenses "saying it was out of her part of that contract."

The claim of M. & J. Brandt to this $1,000 in their own right is thus made clear and it is necessary to examine into the validity of the alleged usage on which their claim rests.

The contention that when a real estate broker is authorized to sell at a specified price the excess, in case of a sale above that price, belongs to the broker, is so utterly untenable that but for the earnestness with which this case has been argued, and the indication in the testimony that a usage is growing, or has grown, up among brokers in this community to appropriate such excess, I would not think it necessary to discuss the proposition or to cite authorities. But the fact that the authority of M. & J. Brandt to make this contract on behalf of the defendant rests on the existence and validity of such a usage, and thus involves not only the rights of defendant, but raises a question of no small public concern, makes it proper that I should consider the matter more fully than I otherwise would, although I can do little more than re-announce what is established law:

It is the duty of a broker employed to sell, to sell for the highest price that he can obtain by reasonable skill and effort.

Raisin vs. Clark, 41 Md., 160.

Mechem on Agency, Sec. 953.

Story on Agency, Sec. 31, Note.

When he is authorized to sell at a specified price, the price named is nothing but the *minimum* below which he cannot sell, but it is just the same his duty to sell at a higher price if by reasonable effort he can do so.

Speaking of the duty of an agent authorized to sell at a stipulated price, the Supreme Court of Massachusetts in Greenfield Bank vs. Simons, 133 Mass., 415, says: "In exercising his functions as agent, it was the duty of the defendant, and his promise was implied, to use reasonable fidelity, diligence and skill to sell to the best advantage of his principal. His *authority* was to sell for not less than a certain price, and his *duty* was to sell for as high a price as could be obtained by the exercise of reasonable diligence and skill."

See also Lewis vs. Dennison, 2nd Tucker, 387-394.

Kellogg vs. Keeler, 27 Ill. App. 244.

It thus being the clearly recognized duty of a broker employed to sell, to sell at the highest price reasonably possible, whether the owner has named a fixed price or not, it is clear, if he sells for more than the fixed price, that the broker can not be entitled to anything beyond his usual commissions for doing what it was his duty to do. But there are numerous authorities directly in point.

That the excess, when a broker is authorized to sell for a specified price, and sells for more, belongs to the owner and not to the broker see:

Mechem, Sec. 470.

4 A. & E. Ency., 969.

Greenfield Bank vs. Simons, 133 Mass., 415.

Lewis vs. Dennison, 2 Tucker, 387-395.

Kerfoot vs. Ayman, 52 Ill., 512.

Denson vs. Stewart, 15 La. An. 456.

Blanchard vs. Jones, 101 Ind., 542.

Merryman vs. David, 31 Ill., 404.

Love vs. Hoss, 62 Ind., 255.

Kellogg vs. Keeler, 27 Ill., App. 244.

Bunker vs. Miles, 30 Me., 431.

Kanada vs. North, 14 Mo., 615.

This excess, therefore, is just as much a part of the purchase money as any other part of the proceeds of sale, and as such belongs to the owner of the property sold. As said in 2 Tucker, 395, any appropriation of such excess by the agent would be a conversion.

Can then the right of the owner to this part of his purchase money be defeated by any usage?

This right of the owner not only rests on the general rules of property, but it is especially safeguarded by the cardinal rule of the law of Agency; that the agent shall not deal with the subject matter of the agency for his own benefit. His position is a fiduciary one; he is not permitted to act in his own interest, and all profits or benefits resulting from the agency belong to the principal.

4 A. & E. Ency., 969.

Mechem on Agency, Sec. 456.

Wharton on Agency, Secs. 236, 238, 299.

As said in Railroad vs. Morgan, 52 Barb. 217: "No custom can be established which contravenes a well settled principle of law. It has been the settled doctrine of the courts, both of law and equity, for centuries, that an agent can not appropriate to his own use any portion of the profits arising from the business of the agency. The custom proposed to be established overrides this rule of law. * * * Such a custom needs only to be stated to be repudiated." 221.

In Lawson on Usages, 294 5, it is said that this is one of the established rules of law which the courts have refused to allow to be changed by proof of a contrary custom.

See also Diplock vs. Blackburn, 3 Camp. 43.

If real estate brokers could establish such a usage as is here set up there is no reason why auctioneers, commission merchants and merchandise brokers of all sorts might not do the same.

It also follows from the fact that the excess belongs to the owner, that a usage which would permit the broker to appropriate it would be a usage under which one man could appropriate the property of another against his consent and without consideration. Such a usage would be unreasonable, contrary to public policy, and would not be tolerated by the courts.

A custom "to appropriate part of the personal chattels of another against his will and without his consent and without consideration" is void.

Delaplane vs. Earnshaw, 15 Gratt, 466.

"The plaintiffs cannot justify the appropriation of the defendant's property by proving any custom to take the property of others."

Wadley vs. Davis, 63 Barb., 500-505.

The usage set up is therefore void and cannot support the alleged contract.

Miss Brandt, however, testifies on re-examination that the defendant agreed that she might have any excess over $25,000 for which the property might sell, and the plaintiff urges that this makes the contract valid. The defendant, however, denies that there was any such agreement, and the testimony fails to prove it.

Finally on examination in rebuttal Miss Brandt testifies that she makes no claim to the surplus in this $1,000 over and above the usual commissions, and thinks its ownership is a matter to be determined by the court. As to the point made on this testimony it is sufficient to say, that the court must look at this contract in the form in which it was executed, and if it was not valid against the defendant when made, it can not be made valid now by any disclaimer or concession.

The admissions made by the defendant in reference to such a contract as he *thought* had been made, can not amount to a ratification of a materially different contract. He supposed that his property had been sold for an even $25,000, and that the purchaser had agreed to pay commissions. But he never knew it had been sold for $26,-000, nor anything about the terms for the payment of the purchase money, until after this bill had been filed.

One other point made by the plaintiff on the contract is, that it provides for the payment of the $500 to "M. & J. Brandt *agents.*" It is manifest, however, from the testimony quoted that, while they called themselves agents, they did not regard themselves as agents of Mr. Brooks *for the collection and payment over to him of this* $500. If it was intended that he should receive this $500, there could have been no purpose in distinguishing it from the $25,000 which was made payable to him. Besides, the testimony shows beyond all question that the excess of $1,000 was claimed by M. & J. Brandt in their own right; that under their construction of the contract the cash payment is retained by them not as agents, but as their own, and the $500 to be paid is to be paid to them individually. Such also was the plaintiff's construction of the contract.

But, apart from all this testimony, and notwithstanding the fact that the brokers call themselves "agents," the fact remains that, while they were the agents of the defendant to procure a purchaser and make a contract of sale in proper form, they were not his agents to receive any part of the purchase money, and could not make themselves such agents.

The duty of real estate brokers employed to sell is to procure a purchaser, but they have no implied authority to receive payment of any part of the purchase money, and payment to them is at the risk of the purchaser.

Mechem on Agency, Sec. 949.

Story on Agency, Secs. 98 and 109.

4 A. & E. Ency., 965.

Wharton on Agency, Sec. 714.

Much less have they any authority to stipulate in the contract that any part of the purchase money shall be paid to them. If under their general authority brokers can make a contract providing that $25,000 of the purchase money shall be paid to the owner and $500 of it to themselves, they could just as well provide that $500 should be paid to the owner and $25,000 to themselves. Even when they are entitled to commissions they must look to the vendor for payment, and when authorized to make the contract of sale, they can not provide therein that part of the purchase money shall be paid to themselves on account of their commissions.

The defendant, therefore, was entitled to receive the whole purchase money, and the plaintiff was not authorized in paying the $500 cash to the brokers and stipulating in the contract that another $500 should also be paid to them, and the defendant in this aspect of the case also is thus not bound by the contract set up. The plaintiff signed the contract as it was submitted to him and no doubt believed he was justified in making the cash payment to the brokers and in stipulating to pay to them the further sum of $500 out of the purchase money, but the plaintiff and every purchaser of real estate must be taken to know that the purchase money belongs to the owner of the property sold, and that he is not authorized to pay, or contract to pay, any part of it to any one else.

It follows from what has been said that the court cannot sustain this contract unless it sanctions the alleged usage which gives to the broker the excess of purchase money realized over a specified price. This it is impossible to do. The contract being void as to the defendant, it is, of course, unnecessary to consider any other questions and the bill must be dismissed.